IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| DON LIPPERT, ) | |
| ) | |
| Plaintiff, ) | |
| ) | No. 13 C 1434 |
| v. ) | |
| ) | Judge Jorge L. Alonso |
| MARCUS HARDY, QUENTIN TANNER,[1] ) | |
| ROYCE BROWN-REED, SALVADOR ) | |
| GODINEZ, JOHN BALDWIN, and ) | |
| RANDY PFISTER, ) | |
| ) | |
| Defendants. ) | |

**MEMORANDUM OPINION AND ORDER**

Plaintiff, Don Lippert, an Illinois inmate who was previously confined at Stateville Correctional Center, brought this action under 42 U.S.C. § 1983, claiming unconstitutional conditions of confinement at Stateville's F-House unit. Defendants Marcus Hardy, Quentin Tanner,[1] Royce Brown-Reed, and Salvador Godinez move for summary judgment and to strike plaintiff's declaration and Local Rule 56.1 submissions. For the reasons explained below, defendants' motion for summary judgment is granted in part and denied in part, and defendants' motion to strike is granted as to plaintiff's reliance on a sample of a "black substance" and denied in remaining part.

**BACKGROUND**

**A.     Defendants' Motion to Strike**

Defendants ask the Court to strike plaintiff's Local Rule 56.1 response and parts of his statement of additional facts and declaration in support of his response to defendants' motion.

---

[1]It appears that Tanner's first name is misspelled in the case caption and several documents. The Court is using the spelling that Tanner provided in his deposition.

Essentially, defendants seek to have the Court carve out what defendants deem to be objectionable or unpersuasive portions of plaintiff's summary judgment materials. This sort of motion to strike is particularly disfavored, *Custom Vehicles, Inc. v. Forest River, Inc.*, 464 F.3d 725, 726 (7th Cir. 2006), and "waste[s] time by requiring judges to engage in busywork and judicial editing without addressing the merits of a party's claim," *U.S. Bank National Association v. Alliant Energy Resources, Inc.*, No. 09–cv–078–bbc, 2009 WL 1850813, at *3 (W.D. Wis. June 26, 2009). "The way to point out errors in an [opponent's filing] is to file a reply brief, not to ask a judge to serve as editor. . . . The judiciary has quite enough to do deciding cases on their merits." *Custom Vehicles*, 464 F.3d at 726. Defendants' motion does not serve much purpose and is therefore denied in large part (with an exception regarding plaintiff's sample of a "black substance," discussed below at note 2). To the extent necessary, the Court will address within its discussion of the summary judgment motion the material to which defendants object.

**B.     Undisputed Material Facts**

Lippert was confined in F-House from 2010 to August 2012, and again from September 2014 until sometime in the latter half of 2016. He lived in several different cells in F-House. Godinez was the Director of the Illinois Department of Corrections ("IDOC") from May 2, 2011 to March 2015. Hardy was the Warden at Stateville from December 2009 to December 31, 2012. Brown-Reed was the Healthcare Unit Administrator at Stateville from May 2010 through October 2015. She was on a leave of absence from March 2011 through November 2011 and from November 2013 through October 2015. Tanner was the Dietary Manager at Stateville during the relevant time frame.

Plaintiff asserts that he experienced the following adverse living conditions in F-House: 1) cold temperatures in his cell, due to defective windows and insufficient clothing and bedding; 2) dirty and moldy showers that do not properly drain; 3) cockroach and bird infestations; 4) unsanitary food conditions; and 5) constant excessive noise, due to the building design.[2] He further asserts that these conditions have contributed to his anger, depression, and anxiety, and caused him to experience headaches, rashes, and difficulty breathing. (ECF No. 100-1, Decl. of Donald Lippert ¶¶ 24-25.)

*Cold Conditions*

Plaintiff says that he was subjected to excessively cold conditions in at least three of his cells. His cell windows, which swung outward, had bent frames, missing seals, and missing latches that were "cut off" prior to 2010 and never replaced.[3] Although plaintiff could open and close his window with a string, the window defects still allowed cold air to enter his cells. In the winter, plaintiff was given plastic bags and tape, and he used his own towels, to try to plug the gaps in an effort to prevent cold air from entering; sometimes he was also given extra blankets, but he was still "freezing." During plaintiff's time in F-House, he never witnessed the repair of a window latch, frame, or seal, but he did witness the replacement of entire window panes with immovable plexiglass sheets.

---

[2]Defendants also include in their filings evidence about mice and nonfunctioning toilets. But plaintiff does not argue in his response brief that those conditions violated the Constitution.

[3]Defendants object to certain testimony in plaintiff's declaration regarding the windows, on the basis that a plaintiff cannot create an issue of material fact by submitting an affidavit that contradicts an earlier deposition. The Court does not perceive any contradictions. At worst, plaintiff is uncertain about exactly when the window latches were cut off. But he is certain that during the relevant time frame, his cell window had a broken latch.

Hardy was aware that "part of the [window] handle[s]" had been removed but believed that the windows were still "functioning." (ECF No. 86-5, Dep. of Marcus Hardy at 75.) He received and read monthly reports of a collection of findings from Stateville security and health-care staff regarding conditions at the prison ("Conditions Reports"). (*Id.* at 14-15.) Every Conditions Report for inspections conducted by security personnel from February 2010 to February 2015 states in capital letters and bold type the following about F-House: "Issues: On all galleries windows needs [sic] to be repaired. Status: Work orders have been submitted." (ECF No. 105, Pl.'s Grp. Ex. K.) The "follow-up" notation states: "Above issues is [sic] pending completion."

*Dirty and Moldy Showers*

At his deposition, plaintiff testified that there was mold growing in the F-House showers.[4] Inmate workers "scraped off" the mold, but it was not professionally removed, and it returned. Even though those workers cleaned the showers with brushes and disinfectant, and inmates who complained about the showers were sometimes given cleaning supplies, the showers were often dirty. The drains often backed up, which resulted in standing water. Plaintiff developed athlete's foot.

---

[4]Plaintiff also submits that he "[r]ecently . . . scraped a sample of black substance off a shower in F House and his counsel had it tested," and the result showed a "light presence" of mold. (ECF No. 100, Pl.'s L.R. 56.1(b)(3)(C) Stmt. ¶ 76.) Defendants object to this statement on the ground that plaintiff did not produce such a sample in discovery. Plaintiff's response is that he "seeks no unfair advantage" and does not object to defendants having an opportunity to conduct discovery regarding the sample. (ECF No. 115, Pl.'s Resp. Mot. Strike at 3.) He provides no reason why the sample was not obtained earlier and produced. Despite plaintiff's stated intention, the Court finds that the untimely production was neither substantially justified nor harmless and therefore plaintiff is not allowed to rely on any sample of a "black substance." *See* Fed. R. Civ. P. 37(c)(1).

Hardy testified that during his tenure as warden of Stateville, he was made aware of inmates' complaints about mold in the showers. (Hardy Dep. at 85.) Hardy also stated that "a lot of [the inmates] didn't understand the difference between a [dirty] shower . . . or mildew as opposed to mold," and that the maintenance department tested for mold, but Hardy was unaware of any test result that indicated the presence of mold. (*Id.* at 85-86.) Maintenance department supervisors, however, testified that their crew did not test for mold, and they were unaware of any instances of mold testing at the relevant times. Stateville documents relating to work orders for work performed in the F-House showers from January 2011 to December 2013 do not include anything concerning mold testing or removal.

*Pest Infestations*

There were cockroaches in plaintiff's cell "constantly" as well as outside his cell in the gallery; plaintiff saw them every day. (Lippert Decl. ¶ 17.) Plaintiff saw them on the food that he stored in his cell and sometimes awoke to them crawling on him at him at night. F-House was also infested with birds. They flew around the F-House galleries and defecated everywhere. Plaintiff says that a bird flew into his cell more than fifty times. At times, there were bird feces on plaintiff's cell's chuckhole (food slot). Plaintiff never saw the implementation of efforts to keep the birds out. He only twice witnessed F-House being power-washed to remove bird feces.

Hardy acknowledged that cockroaches, along with mice and birds, were a "chronic problem" in F-House. (Hardy Dep. at 92-93.) Numerous Conditions Reports from the relevant period state that F-House was "not free" of "insects or rodents" and/or "birds or other animals." (ECF No. 105-3, Pl.'s Grp. Ex. O.) In 2011 and 2012, Critter Ridder, an extermination

5

company, sprayed in F-House.[5] During his tenure as warden, Hardy expanded the extermination services provided in F-House by having individual cells sprayed. Plaintiff, however, estimates that his cell was sprayed only about four times from 2010 to 2012, and he did not see anyone from Critter Ridder in F-House from September 2014 through spring 2016.[6]

*Unsanitary Food Conditions*

Stateville staff and inmates eat the food that is prepared in the kitchen. Stateville inmates eat three meals a day—breakfast in their cells and lunch and dinner in the inmate dining room. Air circulates in the dining room only from open doors and windows, which allow birds to fly in. Fans are used near the serving line. Some Conditions Reports from the relevant time frame indicate that the "inmate kitchen" was "not free" of insects, rodents, and/or "birds or other animals." (Pl.'s Grp. Ex. O.) All of the relevant Conditions Reports created by security personnel state that the "entire kitchen needs revamping" and recite a litany of needed equipment repairs, including broken "hot boxes," leaky and inoperable sinks, broken windows, a cooler without doors, and a drain that "smells like sewer." (Pl.'s Grp. Ex. K.)

Tanner testified that kitchen staff "constantly sanitize daily" and that he has seen mice and roaches in the kitchen but not birds. (ECF No. 86-7, Dep. of Quentin Tanner at 49-50, 63-68.) Dietary workers wear hair nets and gloves. Inmates are provided food on washable food trays, which are sanitized and sent through the dishwasher at proper temperatures.

---

[5]Critter Ridder also sprayed there in 2010, but used expired spray at the time because the State was not paying its bills. Hardy acknowledged that the expired spray was "essentially useless." (Hardy Dep. at 93-94.)

[6]On the ground that plaintiff "cannot provide a factual basis as to when the exterminator sprayed in his cell," defendants object to plaintiff's testimony regarding extermination efforts. (ECF No. 109, Defs.' Mot. Strike at 3.) The objection is overruled because whether plaintiff witnessed an exterminator spraying in his cell is a matter within plaintiff's personal knowledge.

*Excessive Noise*

F-House was a panopticon; in other words, the building was circular.[7] Its design allowed inmates to see, and shout to, each other. It was the loudest unit at Stateville, and its daily atmosphere was one of yelling and banging "all day long." According to plaintiff, the "constant deafening noise" in F-House was "maddening"; contributed to his anxiety and depression; and prevented him from attaining any peace of mind. (Lippert Decl. ¶¶ 21-22.)

## DISCUSSION

**A.      Legal Standards**

"The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The Court must construe the evidence and all inferences that reasonably can be drawn therefrom in the light most favorable to the nonmoving party. *Wesbrook v. Ulrich*, 840 F.3d 388, 391 (7th Cir. 2016); *Kvapil v. Chippewa Cty.*, 752 F.3d 708, 712 (7th Cir. 2014). "A factual dispute is 'genuine' only if a reasonable jury could find for either party." *Nichols v. Mich. City Plant Planning Dep't*, 755 F.3d 594, 599 (7th Cir. 2014) (citation and internal quotation marks omitted). Rule 56 imposes the initial burden on the movant to inform the court why a trial is not necessary. *Modrowski v. Pigatto*, 712 F.3d 1166, 1168 (7th Cir. 2013). Where the nonmovant bears the ultimate burden of persuasion on a particular issue, the movant's initial burden may be discharged by pointing out to the court that there is an absence of evidence to support the nonmoving party's case. *Id.* Upon such a showing, the nonmovant must then "make a showing sufficient to establish the existence of an element essential to that party's case." *Id.*

---

[7]At the time the parties filed their briefs, F-House was the last operating panopticon prison building in the United States. As discussed below, F-House has since been closed.

7

(internal quotation marks and citation omitted). The nonmovant need not depose his own witnesses or produce evidence in a form that would be admissible at trial, but he must go beyond the pleadings to demonstrate that there is evidence upon which a jury could find in his favor. *Id.* at 1168-69 (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 251 (1986)).

**B.      Sufficiently Serious Conditions**

Although the Constitution "does not mandate that prisons be comfortable," *Thomas v. Ramos*, 130 F.3d 754, 763 (7th Cir. 1997), incarcerated persons are entitled to confinement under humane conditions that satisfy "basic human needs," *Rice ex rel. Rice v. Corr. Med. Servs.*, 675 F.3d 650, 664 (7th Cir. 2012). Plaintiff is a convicted prisoner, so the source of this right is the Eighth Amendment's proscription against cruel and unusual punishment. *See id.* "[T]he state must provide an inmate with a healthy, habitable environment." *French v. Owens*, 777 F.2d 1250, 1255 (7th Cir. 1985) (internal quotation marks and citation omitted). A claim of constitutionally inadequate prison conditions requires a two-step analysis. *Townsend v. Fuchs*, 522 F.3d 765, 773 (7th Cir. 2008). The Court first examines whether the conditions at issue were "sufficiently serious" that "a prison official's act or omission result[ed] in the denial of the minimal civilized measure of life's necessities." *See id.* (internal quotation marks and citations omitted). If the inmate demonstrates sufficiently serious conditions, the Court then considers whether prison officials acted with deliberate indifference to those conditions. *See id.*

Inmates have "a right to be free from extreme hot and cold temperatures." *Shelby Cty. Jail Inmates v. Westlake*, 798 F.2d 1085, 1087 (7th Cir. 1986). "[T]he question of whether the severity of the cold, in combination with the length of time which the inmate had to endure it, was sufficient to violate the Eighth Amendment is one which will often be peculiarly appropriate for resolution by the trier of facts." *Dixon v. Godinez*, 114 F.3d 640, 643 (7th Cir. 1997). A lack

of sanitation can also violate the Eighth Amendment. *Gillis v. Litscher*, 468 F.3d 488, 493 (7th Cir. 2006). Furthermore, "prolonged pest infestation, specifically a significant infestation of cockroaches and mice," may be considered a deprivation sufficient to constitute a constitutional violation. *Sain v. Wood*, 512 F.3d 886, 894 (7th Cir. 2008). As for food, correctional officials must provide inmates with food that is prepared and served under conditions that do not present an immediate risk of harm to their health. *French*, 777 F.2d at 1255; *Becerra v. Kramer*, No. 16 C 1408, 2017 WL 85447, at *5 (N.D. Ill. Jan. 10, 2017). Food that is prepared in a manner that "does not meet the minimal standards of safety," or is "routinely unsanitary" so as to present an immediate threat to inmates' health, can rise to the level of a constitutional violation. *Drake v. Velasco*, 207 F. Supp. 2d 809, 812 (N.D. Ill. 2002); *see also Ramos v. Lamm*, 639 F.2d 559, 571 (10th Cir. 1980) (unsanitary kitchen, including kitchen equipment in a state of disrepair, supported the district court's finding of an Eighth Amendment violation). Prison officials may also violate an inmate's Eighth Amendment rights by subjecting him to excessive noise. *Antonelli v. Sheahan*, 81 F.3d 1422, 1433 (7th Cir. 1996) (citing *Williams v. Boles*, 841 F.2d 181, 183 (7th Cir. 1988) (a prison's infliction of incessant noise may be unconstitutional even though it leaves no physical marks)).

"[C]onditions of confinement, even if not individually serious enough to work constitutional violations, may violate the Constitution in combination when they have a mutually enforcing effect that produces the deprivation of a single, identifiable human need." *Budd v. Motley*, 711 F.3d 840, 842-43 (7th Cir. 2013) (per curiam) (internal quotation marks and citation omitted). Similarly, "[a]n adverse condition of confinement, if endured over a significant time, can become an Eighth Amendment violation even if it would not be impermissible if it were only a short-term problem." *Gray v. Hardy*, 826 F.3d 1000, 1005 (7th Cir. 2016).

Defendants contend that none of the conditions of which plaintiff complains, whether considered individually or together, were sufficiently serious to implicate the Constitution. (ECF No. 85, Defs.' Mem. Supp. Mot. Summ. J. at 6.) The Court disagrees. As in *Gray*, defendants "pick apart the individual components of [plaintiff's] claim and [] suggest that each one, alone, is not intolerable." 826 F.3d at 1005. The Seventh Circuit, however, has noted in this context that plaintiffs are entitled to have their complaints evaluated as a whole. *Id.*

Regarding plaintiff's claim of excessively cold temperatures in his cell, defendants emphasize that plaintiff was given extra blankets as well as plastic bags and tape to plug gaps in the windows, and they note that he could open and close his window with a string. But in the Court's view, plaintiff has provided enough evidence on this claim to create a material dispute as to whether the blankets, bags, and tape provided plaintiff with the constitutionally-necessary minimum protection against severe cold. "[N]ot every effort to compensate for inadequate heat will suffice to evade liability under the Eighth Amendment." *Bentz v. Hardy*, 638 F. App'x 535, 537 (7th Cir. 2016). Defendants' argument that plastic bags "provide insulation from the cold," (Defs.' Mem. Supp. Mot. Summ. J. at 8), is unpersuasive, and plaintiff has provided evidence sufficient to that the windows in F-House were defective in a number of ways and that he was exposed to excessive cold for several months over at least two winters.

Furthermore, the Court is satisfied that plaintiff has shown enough to avoid summary judgment on his claims of unsanitary conditions in F-House (dirty and moldy showers, pest infestations, and unsanitary food conditions), when those conditions are considered together. Plaintiff's evidence as to each condition taken by itself might not describe a sufficiently serious condition to meet the first element of the Eighth Amendment analysis, but the Court must take a "holistic" view of plaintiff's evidence. *See Gray*, 826 F.3d at 1005-06; *Bentz*, 638 F. App'x at

536-37. Defendants make much of the undisputed fact that plaintiff has "no education, training, or jobs related to the cleaning or diagnosis of mold," (ECF No. 86, Defs.' L.R. 56.1(a)(3) Stmt. ¶ 19), but plaintiff does not need special training to testify about his personal observations that he saw a black substance in the showers he believed to be mold. (Plaintiff or any other witness would need expert training or experience, though, to testify that the substance caused plaintiff to experience any particular physical effects.) Defendants also point out that Critter Ridder sprayed for pests and that sanitary measures were taken in the kitchen, but such evidence "does not necessarily exculpate the defendants," *Bentz*, 638 F. App'x at 537-38, if those methods were consistently ineffective to combat the sanitary problems created by the allegedly pervasive roaches and birds in F-House. Plaintiff has submitted sufficient evidence of the pests' prolonged existence, the defective windows, and the infrequency of spraying, and that no measures were taken to prevent birds from entering.

As for excessive noise, in the Court's view, plaintiff's minimal testimony about it does not describe a sufficiently serious condition to avoid summary judgment, and plaintiff does not argue that this condition combined with any other condition to deprive him of a single, identifiable human need. And, in relation to the following discussion of deliberate indifference, even if the noise levels in F-House could be considered sufficiently serious, there is no evidence that any of the defendants knew or should have known that the condition posed a substantial risk of serious harm to inmates (and, save for Godinez and possibly Hardy, were in a position to correct the problem, given that plaintiff attributes the noise to the panoptic design of the

building).[8] Because plaintiff has presented insufficient evidence from which a reasonable jury could conclude that plaintiff's Eighth Amendment rights were violated by the noise levels in F-House, the Court grants defendants' motion for summary judgment as to that basis for plaintiff's claim.

C.    **Personal Involvement and Deliberate Indifference**

Only persons who "caused or participated in an alleged constitutional deprivation" can be held liable in a § 1983 action. *Kuhn v. Goodlow*, 678 F.3d 552, 556 (7th Cir. 2012). "A senior [corrections] official who was not personally involved in the acts or omissions complained of nonetheless may be liable in his individual capacity if he can be expected to have either known of or participated in creating systemic inadequate conditions" at the prison. *Warren ex rel. Warren v. Dart*, No. 09 C 3512, 2010 WL 4883923, at *6 (N.D. Ill. Nov. 24, 2010). Ignoring or failing to conduct an investigation of an inmate's grievance can also demonstrate the requisite personal involvement. *Hoddenback v. Chandler*, No. 11 C 50348, 2013 WL 5785598, at *3 (N.D. Ill. Oct. 28, 2013). Courts have found, nevertheless, that "where the official has no control over the condition complained about[,]" the official's review of a grievance or complaint letter, by itself, does not support the type of involvement needed for § 1983 liability. *Hardy v. Godinez*, No. 12 C 6033, 2017 WL 2569605, at *7 (N.D. Ill. June 12, 2017).

"'Deliberate indifference' . . . means that the official knew that the inmate faced a substantial risk of serious harm, and yet disregarded that risk by failing to take reasonable measures to address it." *Townsend*, 522 F.3d at 773 (citing *Farmer v. Brennan*, 511 U.S. 825,

---

[8] If "the officials don't know about [the circumstances constituting the alleged cruel and unusual punishment] or can't do anything about it, the subjective component is not established and the suit fails." *Jackson v. Duckworth*, 955 F.2d 21, 22 (7th Cir. 1992).

847 (1994)). "[I]t is not enough for the inmate to show that the official acted negligently or that he or she should have known about the risk"; rather, there must be a showing that "the official received information from which the inference could be drawn that a substantial risk existed, and that the official actually drew the inference." *Id.*

Defendants contend that there is no evidence from which a factfinder could reasonably conclude that they were personally involved and acted with a sufficiently culpable state of mind. As to Warden Hardy and Director Godinez, the Court is unpersuaded. Hardy received and read monthly reports regarding the cell house conditions at Stateville. Those reports included repeated notations about broken windows and persistent pest problems in F-House as well as broken equipment and pest problems in the kitchen. Plaintiff states in his declaration that when Hardy visited F-House, he complained to Hardy more than once that the broken windows in F-House resulted in his cell becoming very cold in winter. Plaintiff also testified at his deposition that he spoke with Hardy multiple times—"[e]very chance [he] got"—about the birds, the showers, and the broken windows in F-House. (ECF No. 86-2, Dep. of Don Lippert at 35-36.) As warden, Hardy had the power to remedy the problems. Defendants point out that pest-control services were provided; Hardy "reminded staff to keep doors closed" to keep birds out; plaintiff was given plastic bags and tape to "fix" his windows; inmate workers cleaned the showers; and inmates were given cleaning supplies. (Defs.' Mem. Supp. Mot. Summ. J. at 10-11.) Defendants argue that those were reasonable attempts to ameliorate the complained-of conditions that negate any inference of deliberate indifference. According to plaintiff, however, the conditions existed for years and were never resolved. "Knowingly persisting in an approach that does not make a dent in the problem is evidence from which a jury could infer deliberate indifference." *Gray*, 826 F.3d at 1009; *see also Bentz*, 638 F. App'x at 537; *Brown v. Duvall*,

No. 15 C 1672, 2016 WL 3125002, at *6 (N.D. Ill. June 3, 2016). Disputed issues of fact exist regarding whether Hardy was aware of the adverse conditions of which plaintiff complained and whether Hardy took reasonable steps to address them.

Godinez, as IDOC Director, had the power to correct any adverse living conditions at Stateville. To demonstrate Godinez's knowledge of systemic problems in F-House, plaintiff relies on reports issued in 2011 and 2013 by the John Howard Association of Illinois ("John Howard"), a prison watchdog group, following the group's inspections of Stateville. The 2011 report stated that F-House "has no place in a modern, civilized correctional system," and described "substandard" heating, cooling and air ventilation; infestations of birds, cockroaches and other pests; poor sanitation; "showers that are peeling and decaying"; "broken and non-functioning windows"; and a "physical plant that is overall dilapidated and falling apart." (ECF No. 102 at 2.) The 2013 report indicated that the "primary problems" noted in prior reports "persist[ed]" and specifically noted problems with kitchen sanitation and broken equipment. (ECF No. 102-1 at 2, 13.) Godinez acknowledged at his deposition that it was his common practice to read the John Howard reports during the relevant time frame. (ECF No. 86-6, Dep. of Salvador Godinez at 46.) He did not seem to recall specifics about them. He stated that if he had read about unsafe living conditions in such a report, he would "absolutely wonder whether or not" someone who reported to him had "taken action and developed a plan of action." (*Id.* at 47, 49-53.) Defendants contend that plaintiff cannot rely on the John Howard reports because they are inadmissible hearsay, but plaintiff explains that he is not offering the John Howard reports for the truth of the matters asserted, but to show Godinez's knowledge of their contents and the conditions discussed therein. Due to the John Howard reports and Godinez's admission that he reviewed them, disputed issues of fact exist regarding whether Godinez was aware of the

systemic adverse conditions of which plaintiff complains and whether he took reasonable steps to address them.

The same cannot be said of Tanner or Brown-Reed. Plaintiff testified at his deposition that he had personal conversations with both about the unsanitary conditions of which he complained. But he concedes that "it is the most difficult to prove deliberate indifference" as to Brown-Reed, the former healthcare unit administrator. (ECF No. 99, Pl.'s Resp. Mot. Summ. J. at 14.) Her involvement, according to plaintiff, is that some of the Conditions Reports that identify the problems of which plaintiff complains were "sent through" Brown-Reed's office, identify her as the sender, and bear her initials. (She did not perform the inspections that were the bases for the Reports.) Plaintiff asserts that she "could have submitted work orders or otherwise brought this to the proper officials' attention for correction." (*Id.*) It is not evident what a work order from Brown-Reed would have added to the content of the reports, which were sent to Hardy and many of which noted that work orders had already been submitted for various problems. And there is insufficient evidence that Brown-Reed had the power to remedy the problems mentioned in the Reports. There is also insufficient evidence that Tanner had the power to remedy the kitchen and dining conditions. In his discussion of Tanner's culpability, plaintiff focuses solely on the broken windows in the kitchen. Although Tanner was in charge of the dietary unit, there is no evidence that it was his responsibility to make repairs to the physical premises. He testified that he put in work orders for repairs to be made and had no control over when or whether they were done. Although plaintiff contends that Tanner should have "elevate[d] the problem beyond the usual work order process," (*id.*), that is the extent of the argument. Plaintiff cites no authority for the proposition that such an omission rises to the level of deliberate indifference, and he fails to provide evidence sufficient to establish Tanner's

personal involvement in the complained-of conditions. The Court will accordingly enter summary judgment in favor of Brown-Reed and Tanner.

**D.     Qualified Immunity**

As a final matter, defendants contend that they are entitled to qualified immunity. The Court disagrees. "The doctrine of qualified immunity shields officials from civil liability so long as their conduct does not violate clearly established constitutional rights of which a reasonable person would have known." *Hernandez v. Mesa*, --- U.S. ----, 137 S. Ct. 2003, 2017 WL 2722409, at *4 (June 26, 2017) (internal quotation marks, ellipsis, and citation omitted). Defendants' argument derives solely from their previous arguments, which the Court has rejected in part as discussed. Furthermore, contrary to defendants' assertion that a ruling against them "would require the announcement of new law for which they would have been unaware of at the time of the alleged acts," (Defs.' Mem. Supp. Mot. Summ. J. at 14), "the law defining a prisoner's right not to be subjected to conditions like those plaintiff endured . . . and explaining a prison official's need to take reasonable corrective action" was clearly established at the relevant time. *Brown*, 2016 WL 3125002, at *7 (citing, *inter alia*, *Townsend*, 522 F.3d at 774 (unsanitary conditions); *Dixon*, 114 F.3d at 644 (cold temperatures); *Antonelli*, 81 F.3d at 1431 (pests)).

**E.     Injunctive Relief**

There is a mootness issue that is ripe for a possible motion or stipulation and/or discussion at the next status hearing. In the operative complaint (the Second Amended Complaint), plaintiff seeks injunctive relief in addition to monetary damages. Since the filing of that complaint, F-House was closed and plaintiff was transferred to Pinckneyville Correctional Center. It appears, therefore, that plaintiff's request for injunctive relief and his claims against

defendants John Baldwin and Randy Pfister (against whom plaintiff sought only injunctive relief) are moot.[9] If that is the case, plaintiff should move to dismiss those defendants.

## CONCLUSION

The motion of Marcus Hardy, Quentin Tanner, Royce Brown-Reed and Salvador Godinez to strike certain of plaintiff's summary judgment materials [109] is denied in large part and granted as to plaintiff's reliance on any sample of a "black substance." Defendants' motion for summary judgment [84] is granted in part and denied in part. The motion is granted with respect to defendants Quentin Tanner and Royce Brown-Reed and on plaintiff's claim to the extent it is based on excessive noise. Judgment will be entered in favor of Quentin Tanner and Royce Brown-Reed and against plaintiff. The remainder of defendants' motion is denied. A status hearing is set for August 1, 2017 at 9:30 a.m. to discuss the next steps in this case.

**SO ORDERED.**  **ENTERED:** July 19, 2017

_____  
**JORGE L. ALONSO**  
**United States District Judge**

---

[9]Accordingly, the Court has not addressed defendants' argument that plaintiff's claim for injunctive relief is duplicative of the claims being litigated in a separate case pending in this district.